## STUART v. GOUGH.

No. 14775—Opinion Filed June 23, 1925.

**1. Courts—Rule of Property—Land Titles.**

Where the Supreme Court by judicial decision established a rule of property relating to the location and title of lands, such rule is binding, not only upon all parties dealing or attempting to deal with such property, but is binding upon all courts of inferior jurisdiction.

**2. Vendor and Purchaser—Failure of Title—Possession Under Contract—Rescission and Restoration by Purchaser.**

Where a vendee has a contract for title of land and is put in possession thereof by the vendor, the vendee may resist the payment of the purchase money when the title of the vendor has failed, but must, in order to avail himself of that defense, offer to rescind and restore the premises to the vendor.

**3. Appeal and Error—Reversal—Judgment Violating Rule of Property.**

When the Supreme Court of this state has established a rule of property with reference to a particular piece, parcel, or tract of land, and an inferior court renders judgment in a case where the title to such property is involved, in direct opposition to the rule of property so established, this court will reverse the judgment of the

trial court, and direct the trial court to render such judgment as should have been rendered.

(Syllabus by Ruth, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Pawnee County; Redmond S. Cole, Judge.

Action by John A. Stuart against J. Gough on a promissory note, and to foreclose a vendor's lien upon certain real property in Pawnee County. Judgment for the defendant, and plaintiff appeals. Reversed and remanded, with directions.

L. V. Orton, for plaintiff in error.

McCollum & McCollum, for defendant in error.

Opinion by RUTH, C. The parties hereto will be designated as they appeared in the trial court.

Plaintiff in his petition alleges defendant, on June 5, 1918, made, executed, and delivered to plaintiff a certain promissory note, payable on demand, for the sum of $400, bearing 10% interest, and provided further for 10% attorney's fees. That on March 10, 1919, defendant paid the sum of $10 on the principal and paid interest until February 5, 1921, and there is now due $390, as principal, and interest from the last said date, and there is further due on the note the sum of $40 as attorney's fees. That at the time of the execution and delivery of the note, plaintiff was the owner of certain real property known as the "Stroud" property, and described as "lots 19, 20, 21 and 22 in block 8 in the town of Ralston, Pawnee county, Okla." That plaintiff agreed in writing to sell to defendant said property, and executed and delivered deed for same upon payment of the note; that defendant immediately took possession of the property and the buildings thereon erected, and has occupied the same continuously since the execution of the written agreement to sell. That on January 28, 1922, plaintiff tendered defendant a warranty deed to said property, together with an abstract of title covering said lots, and demanded payment of the note, which was by the defendant refused, and plaintiff prays judgment for the sums, and foreclosure of his vendor's lien on the real property. Plaintiff attaches a copy of the written agreement, which is in the following words and figures:

"June 5th, 1918. Upon payment of one $400 note, plus ten per cent interest, dated June 5, 1918, due on demand John A. Stuart agrees to give John Gough a deed to the property by the Park, known as the Stroud property, provided said note is paid by June 5, 1920. (Signed) John A. Stuart."

Defendant answered by general denial, except such things as are specifically admitted in the answer.

Defendant admits the execution of the note, the $10 payment, and the payment of interest up to February 5, 1921.

"Defendant admits that at the time of the execution of said note plaintiff agreed in writing to sell to defendant certain real estate known as the Stroud property, and further admits that Exhibit 'B' attached to plaintiff's petition is a correct copy of such written agreement, and further admits that the Stroud property mentioned in said contract consists of lots numbered 19, 20, 21 and 22 and in block 8 in the town of Ralston, Pawnee county, Okla."

Defendant then alleges that plaintiff represented to him that the Stroud property mentioned and described in said written contract included lots 15, 16, 17, and 18 in block 8, town of Ralston. That at the time defendant did not know just what property was covered by the general description of the "Stroud" property, and plaintiff fraudulently represented that the Stroud property included lots 15, 16, 17, and 18 in said block, and if he had known the Stroud property included only lots 19, 20, 21, and 22 he would not have executed the notes.

Defendant admits he moved into the house and took possession of the buildings on the land, but the house and buildings were on lots 15, 16, 17, and 18, and he obtained a quitclaim deed from Elizabeth Thompson and H. E. Thompson, and from certain holders of tax deeds on lots 15, 16, 17, and 18, and has paid taxes on said lots; that plaintiff is not able to give defendant a deed to lots 15, 16, 17, 18, and 19, 20, 21, and 22 in block 8, town of Ralston.

Defendant alleges he was led to believe the Stroud property included eight lots, whereas it included but four lots, to wit, 19, 20, 21, and 22, and did not include the house and other buildings. He then enumerates the items of expense incurred by him, plus the amount of principal and interest paid plaintiff, and prays judgment over against plaintiff in the sum of $258.37, and that his title to lots 15, 16, 17, and 18 in block 8 be quieted in him.

Plaintiff replies, first, by general denial, and further alleges there is no such property as lots "fifteen (15) sixteen (16) seventeen (17) and eighteen (18) in block eight (8) in the town of Ralston, Pawnee county, Okla."

"(3) That a man by the name of H. E. Thompson originally owned what is known now as block eight (8) in Ralston, Okla., and along about the year 1902 he had block number eight (8) surveyed and platted into lots with two tiers of lots, with a street running east and west between the tiers of lots, numbering from one to eighteen inclusive north of the street, said street known as Woodland avenue, and said lots numbering from 19 to 37 inclusive on the south side of said avenue. That north of said Woodland avenue was a reserve of land known as the park reserve which belonged to the town of Ralston, and said park extends south to Woodland avenue; in other words, the north line of Woodland avenue is the south line of the park reserve. Subsequent to the platting of said block eight (8) and the selling of the lots, the town caused the park reserve to be surveyed, and it was ascertained that all lots north of Woodland avenue, which was supposed to be the north one-half (½) of block eight (8), that is, lots one to eighteen, inclusive, were situated in the park reserve on land that was not owned by Thompson, but on land that was owned by the town of Ralston, and for that reason there is no such lots in existence now and never were, or of lots one to eighteen in block eight (8) and that the only lots that are in existence in said block eight (8), are those numbering from 19 to 37 inclusive.

"(4) That all of said matters were fully adjudicated and litigated in the district court of Pawnee county, Okla., in the case of A. W. Stroud v. Maria Elliott and J. W. Elliott about the year 1911 and said case went to the Supreme Court of Oklahoma and the decision was affirmed September 29, 1914, and the decision is reported in 45 Okla. 447, 145 Pac. 804, and said matters were finally and conclusively adjudicated at that time, and the judgment and decision in that case is referred to and made a part of this reply by reference. That the A. W. Stroud mentioned in that lawsuit is the same Stroud referred to by the plaintiff in the contract he made with the defendant in this case, and the property that the said Stroud owned was lots nineteen (19), twenty (20), twenty-one (21) and twenty-two (22), in said block eight (8), and that his house and buildings were situated on said property.

"(5) That the defendant in this case cannot avail himself of his purported defenses unless he offers to and is willing to restore to the plaintiff all of the property of every kind and character, and the possession thereof, that the plaintiff turned over to the defendant, and he must get out of the property and surrender the entire possession thereof to the plaintiff before he can avail himself of the things he has set up in his answer.

"(6) That if the defendant has paid money for conveyance as to lots fifteen (15), sixteen (16), seventeen (17) and eighteen (18) in block eight (8), and if he has paid taxes thereon, it is no concern of the plaintiff, and the plaintiff is not chargeable therewith, and the same is not a matter of set-off or counterclaim in favor of the defendant and against the plaintiff.

"(7) That the defendant is also precluded and estopped from pleading fraud in such matters because of the fact that he made several interest payments on the note, and he paid $10 on the principal, and he has otherwise ratified, approved, and confirmed the note and contract that he made with the plaintiff."

It appears from the evidence that one H. E. Thompson platted certain land, and divided it into lots and laid out Woodland avenue, running east and west through block 8 of his platted lands, with lots 1 to 18, both inclusive, lying north of the avenue and lots 19 to 37 lying south of the avenue.

This plat was filed in the office of the register of deeds (now county clerk) in Pawnee county, in 1902. Thompson then sold lots both north and south of Woodland avenue, and some home building was done on the lots so sold. Subsequently the officials of the town of Ralston caused a survey of the town's park reserve to be made, and this survey disclosed the fact that lots 1 to 18, both inclusive, and lying north of Woodland avenue, had been staked out on town park property, and those who built north of Woodland avenue were required to and did remove the buildings they had erected thereon. Among others, it appears A. W. Stroud purchased lots 17, 18, 8, 9, 10, 11, and 12, and that Marie Elliott had purchased lots 25, 26, 27, 28, and 29 in block 8, all lying south of the avenue, and immediately across the avenue and south of Lots 8, 9, 10, 11, and 12, block 8, and after the town park survey was made and the occupants of all lots north of the avenue were required to vacate, Stroud brought his action in ejectment against Marie Elliott, and sought to establish the fact that lots known as 25, 26, 27, 28 and 29 were in fact lots 8, 9, 10, 11 and 12, and sought to locate Woodland avenue approximately 125 feet south of its original and present location, and to establish and locate lots 19 to 37, inclusive, south of the attempted new location of Woodland avenue, and upon lands that overflowed from the creek and were practically worthless. The judgment in the case of Stroud v. Elliott was for the defendant, and the plaintiff appealed to the Supreme Court of Oklahoma, and an opinion was filed therein by the Supreme Court

on September 29, 1914, and reported in (Stroud v. Elliott) 45 Okla. 447, 145 Pac. 804, and on page 449 in the body of the opinion this court said:

"While plaintiff testifies he is the owner of, and resides on lots 17 and 18 in the northwest corner of block 8, and that he also owns lots 8, 9, 10, 11, and 12, which he says are in possession of defendants, yet the other testimony, which is not denied, shows that lots 17 and 18 and 8, 9, 10, 11, and 12 are in the park reserve, and that, as a matter of fact, plaintiff resides on and owns lots 19 and 20 and that defendants claim and are in possession of lots 25, 26, 27, 28, 29, of block 8, and make no claim whatevere to lots 8, 9, 10, 11, 12. The plat introduced in evidence shows this state of facts. Witnesses testify, and in fact plaintiff also testifies, that people purchased lots north of Woodland avenue, and erected houses, which lots are just across the avenue north of plaintiff's and defendant's property and they were required to move their improvements by the town authorities, on account of the same being in the park reserve. It is clear from the plat and all the other testimony in the case that all of the north half of what was supposed to be the north half of block 8, including lots 1 to 18, inclusive, were, as a matter of fact, in the park reserve, and defendants do not claim any interest in them. If plaintiff desired to recover the land covered by lots 8, 9, 10, 11, 12, he should have sued the town, as it is clear from this record that defendants do not claim any interest in the lots described in plaintiff's petition. It would appear that his proper remedy would be a suit for breach of warranty in his deed of conveyance from Thompson."

This opinion, rendered 11 years ago, established a rule of property as to lots in block 8, town of Ralston, and was notice to the world that lots 1 to 18, inclusive, were legally nonexistent, and was binding upon all parties' dealing or attempting to deal with property in block 8.

In the case under review the plaintiff, Stuart, testified he bought this property from Stroud, the same Stroud who was plaintiff in Stroud v. Elliott, supra; that the house on the property would cost from $1,000 to $1,500 to build; that Stroud had lived on this identical property south of Woodland avenue some 16 years. That defendant Gough had never made any contention against buying the property until after the deed and abstract had been tendered him by plaintiff.

A. O. Walker, county surveyor, testified he made a survey of block 8, and there was not room enough south of the park reserve to get in two tiers of lots, and that

the north half of block 8 was laid out in the public park.

F. J. Jones testified he lived in Ralston 25 years. That Woodland avenue was laid out and staked out and has always been used in the same place. That he knew the house Stroud built and lived in so long; that it is south of Woodland avenue and is the same house Gough, the defendant, now lives in. Marie Elliott (defendant in Stroud v. Elliott, supra) testified to the same effect, and that the Stroud house now occupied by Gough is south of Woodland avenue and in the same tier of lots as her lots.

This evidence is corroborated by E. M. Adams, Joe Hinkle, and L. V. Orton.

V. M. Harry testified Gough took out insurance on this house payable to plaintiff Stuart and never contended the title was not good, and witness was present when plaintiff tendered defendant deed to property (January 28, 1922), and Gough said he would pay the note in a few days.

Defendant Gough testified there was a six-room house on the property, and from the south side of his house down to the creek is 50 or 60 feet, and that when the creek overflows it comes up within 15 feet of the house.

It is manifest from defendant's evidence that if the house and buildings are on lots 15, 16, 17, and 18, and Woodland avenue is south of these lots, and lots 19, 20, 21, and 22 are south of Woodland avenue as he would locate it, the avenue and lots 19 to 22 would be in the creek bed.

Defendant further testified he paid taxes on lots 19 to 22; that he was still living on the same property; that plaintiff had offered him deed to same; that he had "insured the house a couple of times." That he did not intend to vacate the premises or give it to plaintiff; that when he bought the property he knew that other people had built houses on the north tier of lots in the park and that those houses had to be moved, as the north tier of lots was in the park, and he knew that Stroud had lived in this identical house for a number of years, and, was known as the Stroud property, and that the travel is on Woodland avenue, north of his house and there is no open road south of his house. That after he had lived there about three years he bought quitclaim deeds on lots 15, 16, 17, and 18, but before he obtained the quitclaim deeds he knew the parties he was dealing with could not locate the lots.

J. C. Cales, called for defendant, testified

he made a loan on the Stroud house in 1903, and the property upon which the house stood was described as lots 19-20, block 8, and this is the property upon which the defendant lives.

It appears that after all the evidence had been submitted the court was requested to view the land, and this the court did, but the court also called a surveyor into his chambers and had the surveyor go out and make a survey, and submit a plat or blue print of block 8, and the court reopened the case, over the objection of counsel for plaintiff, and admitted this blue print in evidence.

The surveyor was not called as a witness, but it was admitted the blue print was made by the county surveyor, and this map differed from the original plat filed and of record in the county clerk's office in Pawnee county, and this new survey practically placed Woodland avenue and the south tier of Lots (19 to 37, inclusive) down in the creek bottoms.

The court thereupon found, as shown by its journal entry of judgment:

"First. That defendant had executed the note sued upon and paid $10 on the principal sum. Second: That plaintiff put defendant in possession of the house and defendant is still in possession of the same and has never offered to deliver it to plaintiff. Third: That plaintiff believed the Stroud property was lots 19, 20, 21 and 22, block 8, and tendered defendant a warranty deed thereto in 1922 and an abstract of title showing a good merchantable title. Fourth: That the note sued on was given by defendant in payment for the real estate described in the contract and that when the said block 8 was surveyed and staked out in 1902, lots 1 to 8 inclusive were staked out in the public park and the park lies north of block 8. Fifth: That Woodland avenue was staked out in 1902, the same time the lots were staked out, and is in the same place and has ever since been used by the public, and is on the south side of and adjacent to the public park. Sixth: That the house delivered to defendant by plaintiff is on land in the same tier of lots as the Marie Elliott lots, and the Elliott lots are immediately east of the property defendant obtained from plaintiff, and that the Elliott property was in litigation and the cause was decided by the Supreme Court, in 1914, and reported in 45 Okla 447. Seventh: The court further finds that it is not bound by, and it refuses to follow the decision in the Stroud-Elliott Case. That the property plaintiff placed defendant in possession of lies south of the road, 'that is now and always has been used and traversed by the public as Woodland avenue.' Eighth: That plaintiff purchased lots 19-22 from Stroud, after and with knowledge of the Stroud v. Elliott decision. Ninth: That according to the original survey and recorded plat lots 1 to 18 inclusive lay immediately south of and adjacent to the park and lots 19 to 37 lie immediately south of Woodland avenue."

The court finds that Woodland avenue has never been opened and traversed by the public; that plaintiff never owned lots 15, 16, 17, and 18, that were staked in the park.

"The court then finds that lots 1 to 18, block 8, do exist regardless of the opinion of the Supreme Court in the Stroud v. Elliott Case, wherein this court said lots 1 to 18 inclusive were in the public park and were legally nonexistent"

The court then proceeds to find that the lots occupied by defendant and delivered to him by plaintiff are in reality lots 15 to 18, inclusive, notwithstanding the court had already found the said lots were in the same tier of lots as lots 25 to 28 owned by Marie Elliott, and immediately west of the Elliott lots, and notwithstanding the court found that lots 1 to 18, inclusive, were on the north side of Woodland avenue and lots 19 to 37, inclusive, were on the south side of said avenue.

The court then proceeds to cancel the note given by defendant to plaintiff, and award defendant title to lots 15 to 18, inclusive, and to decree that the improvements are on lots 15 to 18 notwithstanding Stroud erected the house in 1903, borrowed money on it as on lots 19 to 22, and defendant insured the property as being on lots 19 to 22.

The findings of the court are very contradictory and we find it impossible to reconcile them. The court first finds Woodland avenue immediately south of and adjacent to the public park. It then finds it immediately south of and adjacent to a tier of lots numbered one to eighteen, inclusive. It then finds Woodland avenue is where it always has been, since the original plat was filed, and is now and always has been, used and traversed by the public as Woodland avenue; it then finds Woodland avenue has never been opened and traversed by the public. It then finds lots 1 to 18 were originally staked out in the public park, north of Woodland avenue, but by decree the court places lots 1 to 18 south of the park, and where it has just said Woodland avenue is now and always has been. It then attempts by judicial decision to pull Woodland avenue out from under lots 1 to 18 and place it south thereof, and to pull lots 19 to 37 out from under Woodland avenue and lots 1 to 18; and place 19 and

37 south of the new Woodland avenue, established by the court, and place them in the creek and finds them "of very small value."

While the trial court found lots 15 to 18 were in the same tier of lots and immediately west of the Elliott lots (25 to 29, inclusive) it proceeds to pick up lots 19 to 22, and throw them in the creek "as of little value," and announces the "court is not bound by, and refuses to follow" the decision of the court. We recall reading in Greek mythology of the giant sons of Aloeus, who, in their wars against the Gods, placed Ossa on the top of Olympus, and Pelion upon Ossa, or as Virgil relates, "Piled Ossa on Pelion and rolled Olympus upon Ossa." While the giant sons of Aloeus are supposed to have accomplished this Herculean feat with force of arms or the sword, the trial court in this case piles lots 1 to 18 on top of lots 19 to 37, and piles them all on top of Woodland avenue, and then pulls lots 19 to 37 out from under the pile and throws them in the creek with a mere stroke of the pen, thus proving "the pen is mightier than the sword."

We cannot find one scintilla of evidence in the record reasonably sustaining the judgment of the trial court that lots 19 to 22 purchased by Stuart from Stroud, and by Stuart sold, and possession thereof delivered to defendant Gough, are lots 15 to 18, save and except the survey and blue prints the court had made some 21 years after the original survey and plat was made and recorded.

The rule of property respecting block 8, town of Ralston, as decided by this court in Stroud v. Elliott, supra, is binding upon all the world, and when this court has said that lots 1 to 18 are legally nonexistent, they will remain legally nonexistent until again brought into existence by a decision of this court. This court decided lots 1 to 18 were in the public park, and there they shall remain until this court reverses its opinion or the town of Ralston vacates that portion of the park. To hold otherwise would result in chaos. The purchasers of lots 1 to 18 could claim lots 19 to 37 and the purchasers of lots 19 to 37 would be compelled to move their improvements south and into the creek, and at some future time another district court might decree they must be moved back again. It is no concern of this court that defendant obtained quitclaim deeds and tax deeds from various parties who admitted they could not locate lots 15 to 18 which they purported to deed to defendant, and if he did

so pay for and accept deeds for land that could not be located, and did this after the decision in Stroud v. Elliott, he did so at his peril.

In McDougal v. McKay et al., 43 Okla. 261, 142 Pac. 987, this court, discussing the rule of property as affected by judicial decisions, cites with approval 11 Cyc. p. 555, where it is said:

"Where judicial decisions may fairly be presumed to have entered into the business transactions of a country and have been acted upon as a rule of contracts and property, it is the duty of the court, on the principle of stare decisis, to adhere to such decisions without regard to how it might be inclined to decide if the queston were new.

"This rule obtains, although the court may be of the belief that such decisions are founded upon an erroneous principle, and are not sound, for when parties have acted upon such decisions as settled law, and rights have been vested thereunder, their inherent correctness or incorrectness in the abstract are of less importance than that the rule of property so established should be constant and invariable."

Corpus Juris, vol. 15, pp. 947 to 949, after announcing the rule as cited from Cyc., supra, makes this further observation:

"Stability is especially requisite in the law in regard to titles to real property. Titles may be dependent largely or wholly upon previous decisions, and landed interests would be jeopardized by sudden and frequent changes in the interpretation or construction of legal principles. By reason of this the courts are always reluctant to overrule or reverse a decision when title to real estate will be involved. Therefore, when a court of last resort has announced principles affecting the acquisition of title to real property, and the principles thus announced have become established, and have been frequently recognized and conformed to, and property rights have been acquired thereunder, it has generally been held that the decision should not be overturned."

A full and complete citation of authorities covering the principles announced is to be found in C. J., supra, and it is unnecessary to repeat them in this opinion.

In Minnesota Company v. National Company, 3 Wall. 332, 18 L. Ed. 42, Mr. Justice Greer, speaking for the Supreme Court of the United States, said:

"Where questions arise which affect titles of land, it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by

their change. Legislatures may alter or change their laws, without injury, as they affect the future only; but, where courts vacillate and overrule their own decisions on the construction of statutes affecting the title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change.

"Parties should not be encouraged to speculate on a change of the law when the administrators of it are changed.

"Courts ought not to be compelled to bear the infliction of repeated arguments by obstinate litigants, challenging the justice of their well-considered and solemn judgment."

Plaintiff next contends that if the defendant discovered he was not getting the property he thought he was purchasing, it became his duty when action was brought on the note and to enforce the vendor's lien, to offer in his answer to restore the property to the vendor.

This the defendant refuses to do and declares he has no intention of doing. When defendant imagined he had discovered the lots delivered to him by plaintiff and the improvements thereon were lots 15, 16, 17 and 18 he did not offer to deliver possession of same to plaintiff, but continued to occupy the premises, and pay taxes, insurance, and interest, and then went out and obtained quitclaim deeds and tax deeds from four different parties, paying a total sum of $40 therefor, notwithstanding the parties from whom he obtained these deeds stated they could not locate lots 15, 16, 17, and 18.

We cannot view with favor the acts of defendant in this transaction, and his endeavor to obtain a house costing, according to the evidence, from $1,000 to $1,500 to build, together with other improvements, and divest plaintiff of title to same.

This court has repeatedly held that a vendee, having a contract for title and in possession of land, may resist the payment of the purchase money when the title of the vendor has failed, but must, in order to avail himself of that defense, offer to rescind and restore the premises to the vendor. Pugh v. Stigler, 21 Okla. 854, 97 Pac. 566; Zu'all v. Peyton, 26 Okla. 808, 110 Pac. 773; Herron v. Harbour, 57 Okla. 71, 155 Pac. 506; Joiner v. Ardmore L. & T. Co., 33 Okla. 266, 124 Pac. 1073.

For error manifest in the record, as indicated in this opinion, the judgment of the trial court should be reversed, and this cause remanded, with directions to the trial court to render judgment for the plaintiff as prayed in his petition.

By the Court: It is so ordered.

Note.—See under (1) 15 C. J. pp. 947, 948, 949, §342. (2) 39 Cyc. p. 1942; anno. 21 L. R. A. (N. S.) 363; 27 R. C. L. 615. (3) 4 C. J. p. 1185, §3223.